UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARKETTA MAY,

        Plaintiff,                       Civil Action No. 12-cv-11597

    v.                                District Judge Paul D. Borman
                                      Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

## REPORT AND RECOMMENDATION TO
## GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [12] AND
## DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [17]

In 2004, Plaintiff Darketta May, then 40 years old, suffered a back injury while at work. Since that time, and despite back surgery, she has continued to suffer from pain that she claims is disabling. She therefore applied for disability insurance benefits. The Defendant Commissioner of Social Security denied her application. May now appeals. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 2) are the parties' cross-motions for summary judgment (Dkts. 12, 17; *see also* Dkt. 18). As detailed below, this Court finds that the ALJ completely failed to evaluate the opinions of one of May's longtime treating physician, Dr. Michael White. This was a clear violation of this Circuit's requirement that ALJs provide "good reasons" for assigning a treating-source opinion a particular weight. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546 (6th Cir. 2004). This Court therefore RECOMMENDS that the decision of the Commissioner of Social Security be REMANDED.

## I. BACKGROUND

### A. Procedural History

On March 16, 2007, May applied for period of disability and disability insurance benefits asserting that she became unable to work on October 22, 2004. (Tr. 14.) On November 5, 2009, May testified before Administrative Law Judge Roy Roulhac. (Tr. 28-48.) In a February 26, 2010 decision, ALJ Roulhac found that May was not disabled within the meaning of the Social Security Act. (*See* Tr. 72-81.)

May appealed ALJ Roulhac's disability determination to the Social Security Administration's Appeals Council. On March 23, 2011, the Appeals Council vacated ALJ Roulhac's decision in light of new evidence, including a statement of disability from Dr. Jeffery Kimpson, one of May's treating physicians. (*See* Tr. 86.) The Appeals Council remanded the case to an ALJ for further proceedings. (*Id.*)

On remand, ALJ John Rabaut held a second administrative hearing. (Tr. 49-66.) On August 24, 2011, he issued a decision finding that May was not disabled. (Tr. 14-22.) On February 7, 2012, the Appeals Council denied May's request for further administrative review. (Tr. 1.)

May filed this suit on April 6, 2012. (Dkt. 1, Compl.)

### B. Medical Evidence

In October 2004, when May was working as a nurse's aide, a patient kicked her in the back. (Tr. 296, 364.) The next month, an internist and May's primary-care physician, Dr. Michael White, diagnosed May with acute/chronic lumbosacral pain and radiculopathy, cervical radiculopathy, and obesity. (Tr. 296.) May, who stands 5' 3" tall, then weighed 280 pounds. (*Id.*)

May underwent a lumbar-spine MRI in December 2004; it revealed "a large central disc

herniation leading to effacement upon the thecal sac and both S1 nerve root sleeves within their respective lateral recesses" at L5-S1. (Tr. 409.)

In January 2005, Dr. White opined that May would be "incapacitated" for six weeks. (Tr. 405.)

May unsuccessfully attempted to alleviate her pain through physical therapy. In February 2005, after nine sessions, May's physical therapist remarked, "[t]he patient demonstrates minimal to no change in lumbar range of motion, posture, gait and function with stable pain symptoms since starting treatment. The patient has been unable to achieve short-term goals due to pain level." (Tr. 397.)

In March 2005, May began seeing Dr. Teck Mun Soo, a neurosurgeon whom she would continue to see for two years. Dr. Soo performed a physical exam and reviewed the lumbar-spine MRI taken in December 2004. (Tr. 392-93.) He thought it showed a central disc herniation at L5-S1, and opined that May's back pain "could only be addressed with fusion." (Tr. 394.) He noted, however, that a cervical-spine MRI was necessary before any surgical decisions could be made, and recommended steroid injections and Vicodin as interim treatment. (*Id.*) When Dr. Soo later reviewed the cervical-spine MRI, he interpreted disc herniation and cord compression at C5-C6, but noted that the compression was not significant. (Tr. 381; *see also* Tr. 541.)

Dr. White authored a letter to an obesity center in April 2005. He explained that May suffered from "multiple herniated discs." (Tr. 379.) He also noted, however, that it was his and Dr. Soo's opinion that May, who then weighed 281 pounds, needed to undergo gastric bypass surgery. (Tr. 379.)

In early June 2005, Dr. White noted that May was "living on Vicodin for pain." (Tr. 293.)

3

On June 10, 2005, May underwent the recommended gastric bypass. (Tr. 292.) Within a few months, May had lost 72 pounds. (Tr. 350.)

In October 2005, on an employment-related form, Dr. White provided that May was unable to stand, bend, pull, or walk or sit for any length of time. (Tr. 351.)

In the spring and summer 2006, May was primarily treated by Dr. Soo. In April, another MRI was taken of May's spine. (Tr. 565; *see also* Tr. 338.) Dr. Soo thought that it showed a moderate-sized, broad-based disc herniation at L5-S1. (Tr. 388.) The next month, Dr. Soo examined May and found "tenderness of severe nature in the lumbosacral region." (Tr. 337.) He explained, "[t]he patient has failed conservative treatment; therefore, I am offering the patient surgery." (Tr. 339.) Dr. Soo performed a posterior fusion at L5-S1 in July 2006. (Tr. 325, 331, 334.) In a September 2006 follow up, Dr. Soo noted that May had reported a "70% improvement in her back pain." (Tr. 329.)

Later in September 2006, Bill Bean, a physical therapist, summarized May's condition following her post-surgery physical therapy. (Tr. 511; *see also* Tr. 515.) He provided that May was able to walk without "assistive devices and is able to perform almost all activities of daily living." (Tr. 511.) Although May still reported having some restrictions, "she [was] doing quite well at home." (*Id.*)

In December 2006, May returned to see Dr. Soo. (Tr. 321-23.) Her leg pain had improved but her right lower back and buttock pain persisted. (Tr. 321.) Dr. Soo provided that May should continue "conservative treatment in the form of pain clinic management with Dr. [Jeff] Kimpson." (Tr. 323.) He prescribed Vicodin and opined that May could return to work with a 25-pound lifting restriction. (*Id.*)

4

That month, May began treating with Dr. Jeffrey Kimpson, then the medical director of a hospital pain-management center. (Tr. 322.) May reported that her pain was constant and was aggravated with activity. (Tr. 321.) She rated it at five-out-of-ten. (Tr. 322.) Dr. Kimpson found that May walked slowly and had a limited range of motion in her lumbar spine. (*Id.*) He provided, "[t]here are painful palpable trigger points in the right lumbar paravertebrals and gluteals." (*Id.*) He diagnosed lumbar radiculopathy and recommended a trial of three epidural steroid injections, one every two weeks. (*Id.*; *see also* Tr. 547-48, 564.)

On February 18, 2007, Dr. Soo maintained that May could at least return to part-time work. He provided the following restrictions: no lifting more than 10 pounds, no bending or stooping, and sitting and walking "as tolerated." (Tr. 488.)

Later in February 2007, May reported to Dr. Kimpson that although her pain initially improved after the first injection, it had since worsened. (Tr. 559.) May reported pain at the eight-out-of-ten level. (Tr. 559.) Dr. Kimpson found that May's gait was "okay," but she had "painful, palpable trigger points in the paravertebrals and gluteals bilaterally." (*Id.*)

On March 15, 2007, Dr. Soo reviewed a recent MRI of May's lumbar spine. (Tr. 306; *see also* Tr. 319.) He opined, "[o]verall[] [the] study was unremarkable." (*Id.*) Dr. Soo recommended a CT scan and a bone scan. (Tr. 307.) The bone scan was normal. (Tr. 437.) The CT scan showed "normal postoperative changes," "minimal" bulging at L4-L5, and "[d]egenerative changes of the sacroiliac joints." (Tr. 438.)

Although treating with Drs. Kimpson and Soo, May also continued to see Dr. White. On March 20, 2007, Dr. White examined May and found "back tenderness." (Tr. 289.) That same day, in support of May's request for debt-cancellation protection, Dr. White completed a statement

5

providing that May could not lift, push, or pull over five pounds, that she could not stand, and that she could not sit for more than one to two hours per day. (Tr. 314.)

May went back to Dr. Soo in April 2007. (Tr. 301-02.) Although she continued to report low back and bilateral leg pain, Dr. Soo noted that May's range of motion was normal. (Tr. 301.) Dr. Soo also reviewed the CT scan from March 2007. (Tr. 301; *see also* Tr. 438.) He remarked, "At this time, I have no explanation for [Ms. May's] continued back pain. I would like her to undergo a discogram to further delineate her pathology. She is not interested in undergoing this type of study at this time. She will return to see me as needed." (Tr. 302.)

May had visits with Dr. White in July, August, September, and October 2007. (Tr. 568-69.) Although Dr. White's notes are very brief and somewhat cryptic, it is apparent that he continued to prescribe Vicodin. (Tr. 568-69.) Also, in October 2007, Dr. White increased May's prescription of Neurontin and appeared to order an MRI of May's hips. (Tr. 568.)

In September 2007, the Social Security Administration requested a consultative examination and review of May's medical file. Dr. E. Monstair performed the consultative examination and found that May's gait was normal and that her lumbar range of motion was only slightly below normal. (Tr. 584, 585.) Dr. Jack Kaufman reviewed May's medical file, including Dr. Monstair's consultative exam, and completed a residual functional capacity assessment. (Tr. 590-97.) He found that May could lift 50 pounds occasionally, 25 pounds frequently, stand or walk for six hours in an eight-hour workday, sit for six hours in a workday, and engage in unlimited pushing or pulling. (Tr. 591.) He also provided that May had no postural limitations such as kneeling or crouching. (Tr. 592.)

In January 2008, May had a medical consultation with Dr. Mitchell Pollak, an orthopedic

surgeon. (Tr. 572-73.) After physical examination and reviewing MRIs and CT scans of May's pelvis and hips, Dr. Pollak believed that some of May's pain was resulting from "trochanteric bursitis of the right hip" and "[s]ome of it may be residual from her back problems and back surgery." (Tr. 573.) He provided May with a Lidocaine injection in her hip. (*Id.*)

In a June 2008 statement regarding May's ability to volunteer (May volunteered one day per week at a hospital (Tr. 31)), Dr. White provided that May could not lift, push, or pull more than ten pounds, or walk for more than one or two hours per day. (Tr. 571.)

In December 2008, Dr. White provided, on a prescription slip, that May could not stand, walk, or sit for longer than 15 minutes at a time. (Tr. 604.)

In March 2009, on referral from Dr. White, May saw Dr. Anthony Emmer for a neurologic consultation. (Tr. 598-601.) Dr. Emmer reviewed Dr. White's medical records and performed a neurologic exam. (Tr. 599-600.) He opined, "[t]he most likely culprit for her symptoms is that of chronic lumbar radiculopathy. This may be on the basis of failed back syndrome, versus recurrent disc herniation/osteophyte formation." (Tr. 600.) Due to diminished sensation of May's right face and arm, Dr. Emmer recommended an MRI of May's brain. (Tr. 600.) He also recommended another MRI of the lumbar spine. (Tr. 600-01.)

May returned to Dr. Emmer about six months later. (Tr. 605.) She reported that her back pain had been stable until the prior month. (Tr. 605.) Dr. Emmer noted that an MRI showed degenerative changes and a disc bulge at L3-L4. (*Id.*) He remarked, "[Ms. May] has diffuse body musculoskeletal pain. This is either fibromyalgia or other nonneurologic process." (Tr. 605.) He increased May's Neurontin prescription and also prescribed two other medications. (*Id.*)

In early 2010, May started seeing Dr. Kimpson and other physicians at Michigan Pain

Management Consultants with more regularity. (Tr. 608-36.) In February 2010, May reported that her pain was at only a five-out-of-ten level on a combination of Embeda and Vicodin. (Tr. 635.) In March 2010, however, May reported that her insurance would not cover Embeda and that she could not otherwise afford it; Dr. Alexander Ajlouni at Michigan Pain Management Consultants instead prescribed MS-Contin. (*Id.*) In April 2010, May reported nine-out-of-ten pain and so May's MS-Contin dosage was increased. (Tr. 632.) On April 9, 2010, Dr. Kimpson wrote the following to-whom-it-may-concern letter:

> Ms. Darketta May has been treated at the Providence Pain Management Center since December 13, 2006, for lumbar radiculopathy status post laminectomy and fusion. Despite treatment with surgery, epidural steroid injections, physical therapy and medications, Ms. May experiences intractable low back and bilateral leg pain. The option of spinal cord stimulator has been discussed. She has difficulties with activities of daily living and even with light household chores. She experiences numbness, tingling and weakness of her right leg. She is currently being managed on Extended Release Morphine and Vicodin. Ms. May has been, unable to work since December 7, 2004, because of severe intractable pain. In my opinion, Ms. Darketta May is permanently disabled.

(Tr. 631.) From May 2010 to June 2011, May's reports of pain ranged from six-out-of-ten to ten-out-of-ten. (Tr. 608-27.) It appears that the physicians at Michigan Pain Management Consultants continued to prescribe MS-Contin and Vicodin Extra Strength. (Tr. 615.)

### C. Testimony at the Hearing Before the ALJ

#### 1. Plaintiff's Testimony

At her first administrative hearing in November 2009, May testified that she could not work because she was in "constant pain," she could not sit for "long periods," and she could not walk "any distance." (Tr. 35.) She stated that her pain felt as if someone was "twisting and turning" her lower back. (Tr. 36.) As for activities of daily living, May testified that her husband and daughter did

8

most of the housework and cooking. (Tr. 37.) When ALJ Roulhac asked about her volunteer work at the hospital, May explained that during her four-hour volunteering shifts, she would walk "[n]inety percent" of the time. (*Id.*) (As noted, it appears that May volunteered one day per week. (Tr. 31.)) When ALJ Roulhac pointed out that walking that amount was inconsistent with May's earlier testimony that she could walk for only 15 minutes, May explained that the walking was not constant and it was "difficult" for her to do the volunteer job. (*Id.*)

After the Appeals Council remand, May testified before ALJ Rabaut in August 2011. (Tr. 49-66.) Although May's date last insured is December 31, 2009 (Tr. 17), and therefore she must establish that she was disabled on or before that date, *see Cunningham v. Astrue*, 360 F. App'x 606, 608-09 (6th Cir. 2010), in light of her testimony from the prior hearing, ALJ Rabaut said he was going to ask about May's condition "since like the beginning of 2011." (Tr. 54.) May testified that she had more bad days than good, and on her bad days, she could "barely even move." (Tr. 56.) She explained that without pain medication she has "10 plus" pain, and even with medication her pain never fell "below like a seven." (Tr. 57.)

### 2. *The Vocational Expert's Testimony*

ALJ Rabaut solicited testimony from a vocational expert ("VE") to determine whether jobs would be available for a hypothetical individual with functional limitations that he thought approximated May's. In particular, he asked the VE to consider a person of May's age (then 47), education (two years of college (Tr. 34)), and work experience (certified nurse's assistant (Tr. 34)) who (1) was limited to "sedentary" exertion, (2) needed a sit/stand option, (3) could not climb ladders, ropes, or scaffolds, (4) could only occasionally climb ramps or stairs, balance, stoop, crouch, kneel, crawl, or operate foot controls, (5) needed to use a "hand-held assistive device for

prolonged ambulation," and (6) was limited to simple routine or repetitive tasks performed in a work environment free of fast-paced production, simple work-related decisions, and few, if any, workplace changes. (Tr. 61-62.) The vocational expert testified that there would be jobs in substantial numbers that the hypothetical individual could perform: bench assembler, mail clerk, and sorter. (Tr. 62.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act (the "Act"), disability insurance benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

10

> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Rabaut found that May had not engaged in substantial gainful activity since the alleged disability onset date of October 22, 2004 through her date last insured of December 31, 2009. (Tr. 17.) At step two, he found that May had the severe impairment of lumbar radiculopathy, status post lumbar fusion. (*Id.*) Next, the ALJ concluded that this impairment did not meet or medically equal a listed impairment. (Tr. 17.) Between steps three and four, the ALJ determined that May had the residual functional capacity to perform

> sedentary work as defined in 20 CFR 404.1567(a) [lifting no more than 10 pounds at a time and walking and standing "occasionally"] except the claimant would require a sit/stand option allowing the claimant to sit or stand alternatively at will. The claimant could never climb ladders, ropes, or scaffolds; but could occasionally climb ramps or stairs, balance, stoop, crouch, kneel, and crawl. The claimant would need to utilize a hand-held assistive device for prolonged ambulation or over uneven terrain, the contralateral upper extremity could be used to carry objects up to the exertional limitations. The claimant should avoid concentrated exposure to use of moving machinery, all exposure to unprotected heights, and fast moving hazards. The claimant would be limited to simple, routine, and repetitive tasks performed in a work environment free of fast paced production requirements, involving only simple, work-related decisions, and with few, if any, work place changes.

(Tr. 17.) At step four, the ALJ found that May was unable to perform any past relevant work. (Tr. 21.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone

of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 21.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act. (Tr. 22.)

### III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683

(6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

Plaintiff's lead argument is that ALJ Rabaut erred in evaluating the opinions of her treating physicians, Dr. White and Dr. Kimpson. (Pl.'s Mot. Sum. J. at 15-18.) Given that ALJ Rabaut did not even discuss Dr. White's opinions, the Court agrees as to Dr. White.

In analyzing the treating-source opinions of record, ALJ Rabaut stated:

> While I have given Dr. Kimpson's letter appropriate consideration, I have not given Dr. Kimpson's conclusions significant weight because the limitations identified by Dr. Kimpson are out of proportion with the remaining objective medical evidence contained in the record and Dr. Kimpson's own treatment notes primarily consist of the claimant's subjective complaints of pain. Further, the records from Providence Pain Management Center document the claimant's improvement with medication and mild clinical findings such as the claimant's steady gait and full leg strength. These findings do not support the limitations identified by Dr. Kimpson and his opinion appears to be sympathetic to the claimant.

(Tr. 20.)

Nowhere in the above statement, or anywhere else in ALJ's Rabaut's narrative, is there any discussion of Dr. White's March 2007 statement that Plaintiff could not lift, push, or pull over five pounds, that she could not stand, and that she could not sit for more than one to two hours per day. (Tr. 314.) Nor is there any discussion of Dr. White's June 2008 statement that Plaintiff could not

13

lift, push, or pull more than ten pounds, or walk for more than one or two hours per day. (Tr. 571.) ALJ Rabaut also did not mention Dr. White's December 2008 opinion that Plaintiff could not stand, walk, or sit for longer than 15 minutes at a time. (Tr. 604.) Each of these opinions fall within the disability period.

It is true that in the first administrative decision, ALJ Roulhac discussed Dr. White's June 2008 and December 2008 opinions. In particular, he gave Dr. White's June 2008 opinion "significant" weight while giving the December 2008 statement "limited" weight. (Tr. 77-78.) And it is also true that ALJ Rabaut adopted some of ALJ Roulhac's findings. In particular, ALJ Rabaut stated,

> [A]ll evidence contained in the previous decision is hereby incorporated by reference into this decision as though it were set forth in its entirety. Further, after review [of] the evidence submitted at the hearing level, I find the analysis of the State agency reports by Administrative Law Judge Roulhac is unchanged (Exhibit 3A).

(Tr. 19.) ALJ Rabaut also relied on ALJ Roulhac's analysis of "the clinical findings from Anthony Emmer, D.O., Teck Soo, M.D., Bill Bean, MS, PT, and the State consultative examiner." (Tr. 20.) These passages explicitly provide that ALJ Rabaut was adopting the "evidence as presented" in ALJ Roulhac's opinion, and adopting ALJ Roulhac's analysis of the State DDS physicians, Dr. Emmer, Dr. Soo, and Mr. Bean. Conspicuously absent is a statement that ALJ Rabaut was relying on ALJ Roulhac's analysis of Dr. White's opinions.

And doing so would have been questionable. ALJ Roulhac did not have the benefit of Dr. Kimpson's opinion—which the Appeals Council acknowledged required remand—and Dr. White's December 2008 statement and Dr. Kimpson's statement of permanent disability support one another. At a minimum, they both indicate (Dr. White directly and Dr. Kimpson indirectly) that Plaintiff's

14

functional capacity was so limited that she could not perform the reduced range of sedentary work as set forth in ALJ Rabaut's residual functional capacity assessment. In other words, ALJ Roulhac considered Dr. White's opinions but not Dr. Kimpson's, and ALJ Rabaut considered Dr. Kimpson's opinion but not Dr. White's. As the Appeals Council implied, some ALJ needs to consider the two together.

Remand is therefore warranted. Dr. White's opinion has not been assigned a weight, and has not been evaluated according to the factors set forth in 20 C.F.R. § 404.1527(c). When a treating-source opinion goes unaddressed, Sixth Circuit precedent dictates remand. *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) (providing that, before rejecting a treating-source opinion, an ALJ must "conduct the balancing of factors to determine what weight should be accorded these treating source opinions"); *Sawdy v. Comm'r of Soc. Sec.*, 436 F. App'x 551, 553 (6th Cir. 2011) ("When an ALJ violates the treating-source rule, '[w]e do not hesitate to remand,' and 'we will continue remanding when we encounter opinions from ALJ[s] that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.'" (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009))); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009) ("Even assuming arguendo that the ALJ correctly reached her determination that [the treating source] should be discredited, the ALJ's summary rejection of [the treating source] without explaining the weight given his opinions falls short of the Agency's own procedural requirements . . . ."); *Rogers*, 486 F.3d at 243 ("[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." (emphasis added)).

15

Remaining is whether this case should be remanded for an award of benefits or for further fact finding and analysis by an ALJ. Plaintiff, relying on *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646 (6th Cir. 2011), argues for the former. But *Johnson* is distinguishable and the Court believes remand for further analysis would be more prudent. In *Johnson*, the plaintiff's primary basis for disability was pain and she treated with a pain specialist twenty-two times over a two-year period. *Id.* at 652. Here, Dr. White was Plaintiff's primary-care physician and an internist and only saw May a dozen or so times. Stronger, there was no other credible opinion in *Johnson* that contradicted the treating-source opinion, and the treating-source opinion clearly rendered the plaintiff disabled. Here, however, Dr. Soo's December 2006 and February 2007 opinions are arguably consistent with the ALJ's residual functional capacity assessment. (*See* Tr. 20.) Strongest though is that *Johnson* was one step further down the road: the ALJ there provided reasons for discounting the treating-source opinion for the court to review, and the court was therefore in a position to determine whether the reasons were valid. Here, as discussed, the ALJ provided no reasons for discounting (or supporting) Dr. White's opinions.

The Court also believes that if the ALJ properly evaluates Dr. White's opinion, he may decide to give more weight to Plaintiff's testimony: Dr. White's opinions largely support her statements about her functional limitations. For this reason, the Court further finds that Plaintiff's second claim of error, that the ALJ wrongly discounted her credibility, (Pl.'s Mot. Summ. J. at 18-22) is not yet ripe for determination.

In short, a remand for compliance with the treating-source rule is more appropriate than a remand for an award of benefits. The record before the Court is not free of factual conflicts such that it dictates an award of benefits. *Meehleder v. Comm'r of Soc. Sec.*, No. 11-CV-12946, 2012 WL

16

3154968, at *2 (E.D. Mich. Aug. 2, 2012) ("[A] court is obligated to remand for further administrative proceedings if there are any unresolved essential factual issues"); *see also Martin v. Comm'r of Soc. Sec.*, 61 F. App'x 191, 202 (6th Cir. 2003) ("A claimant is not clearly entitled to benefits unless 'the proof of disability is overwhelming or . . . the proof of disability is strong and evidence to the contrary is lacking.' Thus, where there is evidence contrary to a finding of disability, proof of disability is unlikely to be overwhelming and cannot be considered strong." (quoting *Faucher v. Sec'y of Health & Hum. Servs.*, 17 F.3d 171, 176 (6th Cir. 1994))).

The Court acknowledges however, that Plaintiff filed her application for benefits six years ago. If May is ultimately entitled to benefits, this delay will certainly be regrettable. The Court is therefore hopeful that, on remand, the Commissioner will resolve Plaintiff's case as expeditiously as possible.

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that the ALJ failed to evaluate the opinions of one of May's longtime treating physician, Dr. Michael White. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 12) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 17) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED. On remand, the ALJ should evaluate Dr. White's opinion, assign a weight to his opinion consistent with the factors set forth in 20 C.F.R. § 404.1527(c), and, if necessary, reevaluate May's credibility.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).

17

Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

                                          s/Laurie J. Michelson
                                          LAURIE J. MICHELSON
                                          UNITED STATES MAGISTRATE JUDGE

Dated: April 29, 2013

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on April 29, 2013.

                                          s/Jane Johnson
                                          Deputy Clerk